IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

     v.

KLAMATH DRAINAGE DISTRICT,

                Defendant.

Case No. 1:22-cv-00962-CL

**OPINION AND ORDER**

**CLARKE**, United States Magistrate Judge:

       This case comes before the Court on Plaintiff's Motion for Summary Judgment (ECF No. 64) and Defendant's Motion for Summary Judgment (ECF No. 60). All parties have consented to jurisdiction by a U.S. Magistrate Judge. *See* ECF No. 26. For the reasons that follow, Plaintiff's

Motion for Summary Judgment is GRANTED and Defendant's Motion for Summary Judgment
is DENIED.

## BACKGROUND

### I.    The Klamath Basin

The Klamath Basin encompasses approximately 12,000 square miles of "interconnected
rivers, canals, lakes, marshes, dams, diversions, wildlife refuges, and wilderness areas" in
southern Oregon and northern California. *In re Klamath Irrigation Dist.*, 69 F.4th 934, 938 (9th
Cir. 2023) (quoting *Klamath Irrigation Dist. v. U.S. Bureau of Reclamation*, 48 F.4th 934, 938
(9th Cir. 2022)). Upper Klamath Lake ("UKL") is a large, shallow freshwater lake in southern
Oregon. *In re Klamath Irrigation Dist.*, 69 F.4th at 938; *Klamath Irrigation Dist.*, 48 F.4th at
938. UKL drains into the Link River and, "[f]rom there, water flows into and through Lake
Ewauna to the Klamath River, which then proceeds southwest into California and eventually
joins the Trinity River near the Pacific coast." *In re Klamath Irrigation Dist.*, 69 F.4th at 938. In
recent years, drought conditions have led to "critically dry" conditions in the Klamath Basin,
including in UKL. *Klamath Irrigation Dist.*, 48 F.4th at 938–39 (citing *Baley v. United States*,
942 F.3d 1312, 1323–24 (Fed. Cir. 2019)).

The waters of the Klamath Basin are home to several species of fish that are listed as
endangered or threatened pursuant to the Endangered Species Act ("ESA"). *See id.* at 939; *see
also Baley*, 942 F.3d at 1324. These species include the Lost River sucker (*Deltistes luxatus*), the
shortnose sucker (*Chasmistes brevirostris*), and a cohort of coho salmon (*Oncorhynchus kisutch*)
known as the Southern Oregon/Northern California Coast ("SONCC") evolutionary significant

unit ("ESU")[1]. *See* Final Rule, Determination of Endangered Status for Shortnose Sucker and Lost River Sucker, 53 Fed. Reg. 27,130 (July 18, 1988); Final Rule, Threatened Status for SONCC ESU of Coho Salmon, 62 Fed. Reg. 24,588 (May 6, 1997). UKL is critical habitat for the suckers. *See* Final Rule, Designation of Critical Habitat for Lost River Sucker and Shortnose Sucker, 77 Fed. Reg. 73,740 (Dec. 11, 2012). Most of the Klamath River below the Iron Gate Dam is critical habitat for the SONCC coho salmon. *See* Final Rule, Designated Critical Habitat for Central California Coast and SONCC Coho Salmon, 64 Fed. Reg. 24,049 (May 5, 1999). Additionally, although not listed under the ESA, chinook salmon are found in the waters of the Klamath Basin. Declaration of Alan C. Heck ("Heck Decl.") ¶ 6, ECF No. 65. Chinook salmon are a primary prey species for the Southern Resident killer whale (*Orcinus orca*), which is listed as endangered under the ESA. *Id.*; *see also* Final Rule, Endangered Status for Southern Resident Killer Whales, 70 Fed. Reg. 69,903 (Nov. 18, 2005).

## II.    The Klamath Project

### A.    History

The Reclamation Act of 1902 "laid the groundwork for a vast and ambitious federal program to irrigate the arid lands of the western states." *Baley*, 942 F.3d at 1319 (citation omitted); *see also* The Reclamation Act of 1902, Pub. L. No. 57-161, 32 Stat. 388 (codified, as amended, at 43 U.S.C. § 371 *et seq.*). "The Reclamation Act financed irrigation works, with construction costs repaid by Project water users." *Klamath Irrigation Dist. v. U.S. Bureau of Reclamation*, 489 F. Supp. 3d 1168, 1175 (D. Or. 2020).

---

[1] "A salmon stock will be considered a distinct population, and hence a 'species' under the ESA, if it represents an evolutionary significant unit (ESU) of the biological species. The stock must satisfy two criteria to be considered an ESU: (1) It must be substantially reproductively isolated from other nonspecific population units; and (2) it must represent an important component in the evolutionary legacy of the species." Notice, Policy on Applying the Definition of Species under the ESA to Pacific Salmon, 56 Fed. Reg. 58,612 (Nov. 20, 1991).

In 1905, Congress authorized the Secretary of the Interior to advance the Klamath River

Basin Project ("Klamath Project" or "Project"), one of the first projects authorized under the

Reclamation Act. *See id.* (discussing origins and history of the Klamath Project). The Klamath

Project is "a series of complex irrigation works in the region" that the Bureau of Reclamation

("Reclamation") operates "in accordance with state and federal law, except where state law

conflicts with superseding federal law." *In re Klamath Irrigation Dist.*, 69 F.4th at 938 (citations

omitted); *see also Baley*, 942 F.3d at 1319–20 ("Section 8 of the Reclamation Act requires the

Secretary of the Interior to comply with state law regarding the appropriation of water for

irrigation, to the extent such law is not inconsistent with federal law." (citing 43 U.S.C. § 383)).

"Prior to passage of the Reclamation Act, at least part of the Klamath Basin was not arid land,

but wetlands or marshes that were subsequently drained and converted to farmland pursuant to

the Klamath Project." *Baley*, 942 F.3d at 1319 n.7.

On May 17, 1905, pursuant to Oregon law, Reclamation filed a notice of appropriation as

to all of the then-unappropriated waters of the Klamath Basin for the Klamath Project. *See*

*Klamath Irrigation Dist.*, 489 F. Supp. 3d at 1175. "The notice stated that 'the United States

intends to utilize ... [a]ll of the waters of the Klamath Basin in Oregon, constituting the entire

drainage basins of the Klamath River and Lost River, and all of the lakes, streams and rivers

supplying water thereto or receiving water therefrom' for purposes of 'the operation of works for

the utilization of water ... under the provisions of the ... Reclamation Act.'" *Baley*, 942 F.3d at

1320–21 (quoting *Baley v. United States*, 134 Fed. Cl. 619, 626 (2017)) (alteration in original).

**B.    Operations**

In the Klamath Project, water is stored in UKL by means of the Link River Dam. *Baley*,

942 F.3d at 1321. Reclamation owns the Link River Dam. Heck Decl. ¶ 3, ECF No. 65. "Water

is diverted from [UKL] and locations downstream from the lake on the Klamath River and conveyed through canals and laterals to individual users in Oregon and California." *Baley*, 942 F.3d at 1321 (citation omitted). "As part of this process, water is stored and its flow is controlled using a series of dams downstream from the Link River Dam, which is at the south end of Upper Klamath Lake." *Id.* The last of these dams on the Klamath River is the Iron Gate Dam in California. *Id.* In operating the Klamath Project, Reclamation has the "nearly impossible" task of balancing multiple, often competing interests in the Klamath Basin. *Klamath Irrigation Dist.*, 48 F.4th at 940 (quoting *Klamath Irrigation Dist.*, 489 F. Supp. 3d at 1173). Three of those interests are directly implicated here: Tribal water and fishing rights, Reclamation's obligations under the ESA, and Reclamation's contracts with individual irrigators and irrigation districts.

First, Reclamation must operate the Project "consistent with the federal reserved water and fishing rights of the Klamath, Hoopa Valley, and Yurok Tribes that predated the Project and any resulting Project rights." *Id.* at 941. The Klamath Tribes' senior, non-consumptive rights include "the right to prevent other appropriators from depleting the streams['] waters below a protected level" and "the right to certain conditions of water quality and flow to support all life stages of [the Lost River sucker and the shortnose sucker]." *Baley*, 942 F.3d at 1322 (citation omitted); *Klamath Irrigation Dist.*, 48 F.4th at 939–40, 943 (citations omitted). The rights of downstream Tribes, such as the Yurok Tribe and Hoopa Valley Tribe, also require Reclamation to maintain specific instream flows in the Klamath-Trinity River in California. *In re Klamath Irrigation Dist.*, 69 F.4th at 938. "At the bare minimum, the Tribes hold rights to an amount of water that is at least equal, but not limited to, the amount necessary to fulfill Reclamation's ESA responsibilities." *Id.* (citations and quotation marks omitted); *see also Baley*, 942 F.3d at 1337 ("At the bare minimum, the Tribes' rights entitle them to the government's compliance with the

ESA in order to avoid placing the existence of their important tribal resources in jeopardy."). The Tribes' rights "necessarily carry a priority date of time immemorial." *Klamath Irrigation Dist.*, 48 F.4th at 939 (quoting *United States v. Adair*, 723 F.2d 1394, 1414 (9th Cir. 1983)).

Second, Reclamation must operate the Klamath Project in a manner consistent with its obligations under the ESA, which includes maintaining specific elevation levels in UKL and instream flows in the Klamath River. *In re Klamath Irrigation Dist.*, 69 F.4th at 938; *Klamath Irrigation Dist.*, 48 F.4th at 940–41. The ESA "requires federal agencies to consult with specified federal fish and wildlife agencies to ensure that 'any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence' of any species listed for protection under the Act 'or result in the destruction or adverse modification of' the species' critical habitat." *Klamath Irrigation Dist.*, 48 F.4th at 940 (citations omitted). Reclamation develops operating procedures through consultation with agencies "to ensure that its operations do not jeopardize the existence of fish species protected by the ESA, including the Lost River sucker, the shortnose sucker, and the SONCC coho salmon." *Id.* at 940–41.

Third, "Reclamation maintains contracts with individual irrigators and the irrigation districts that represent them, under which the United States has agreed to supply water from the Klamath Project to the irrigators, 'subject to the availability of water.'" *Id.* at 940. These irrigators rely on water deliveries and make investments in crops based upon expected water deliveries. *Klamath Irrigation Dist.*, 489 F. Supp. 3d at 1175. "Delayed access to or decreased amounts of water cause 'long-reaching damages' to the irrigators' businesses." *In re Klamath Irrigation Dist.*, 69 F.4th at 939. The irrigators' rights are "subservient" to the Tribes' rights and Reclamation's ESA responsibilities. *Id.*

Reclamation organizes its contracts into four distinct categories and assigns each category a different priority level within the Klamath Project. Heck Decl. ¶ 13, ECF No. 65. First, Reclamation treats the Van Brimmer Ditch Company's contract, which predates the Klamath Project, as a "settlement" contract that has seniority over all other Project contracts. *Id.* Second, Reclamation treats its contracts with Klamath Irrigation District ("KID") and Tulelake Irrigation District ("TID") as "repayment" contracts, based on KID and TID's presence at the start of the Project in 1906 and obligation to repay the costs of constructing the Project. *Id.* Third, Reclamation treats its contracts under the Warren Act, 43 U.S.C. §§ 523–25, as junior to the repayment contracts. *Id.* KDD's contract is a Warren Act contract. *Id.* Finally, Reclamation treats water rental contracts as the most junior category. *Id.*

As discussed in greater detail below, Reclamation currently operates the Project under a 2018 long-term operations plan, as supplemented by an Interim Operations Plan ("2020 IOP") established in connection with ongoing litigation. *See Yurok Tribe v. U.S. Bureau of Reclamation,* --- F. Supp. 3d ----, 2023 WL 1785278, at *7 (N.D. Cal. Feb. 6, 2023). The 2020 IOP sets forth the criteria that determine the amount of water available for ESA compliance and irrigation purposes each year. Heck Decl. ¶ 10, ECF No. 65. At the beginning of each irrigation season, Reclamation publishes an annual operations plan to inform interested parties of how Reclamation intends to operate the Project during that year's season. *Id.* ¶ 15. The annual operation plan explains how Reclamation intends to meet its ESA obligations and estimates how much water, if any, will be available to Project irrigators during the irrigation year. *Id.* If the available water is less than the amount necessary to satisfy the demands of all Project irrigators, Reclamation will issue a "drought plan" with additional details on the allocation of the limited water supply based on the contractual seniority of the various Project contractors. *Id.*

### III.    Oregon Water Law

Section 8 of the Reclamation Act provides:

> Nothing in this act shall be construed as affecting or intended to
> affect or in any way interfere with the laws of any state or territory
> relating to the control, appropriation, use, or distribution of water
> used in irrigation, or any vested right acquired thereunder, and the
> Secretary of the Interior, in carrying out the provisions of this Act,
> shall proceed in conformity with such laws, and nothing herein
> shall in any way affect any right of any state or of the federal
> government or of any landowner, appropriator, or user of water in,
> to, or from any interstate stream or the waters thereof.

43 U.S.C. § 383. In Oregon, all water belongs to the public. ORS § 537.110. Water rights are

usufructuary in nature, meaning water rights holders own the right to "use of water, and not the

water itself[.]" *Sherred v. City of Baker*, 63 Or. 28, 39, 125 P. 826, 830 (Or. 1912).

### A.    Prior Appropriation Doctrine

Oregon follows the doctrine of prior appropriation of water rights. *Teel Irrigation Dist. v.*

*Water Res. Dep't*, 323 Or. 663, 666–67, 919 F.2d 1172, 1174 (Or. 1996). Under this doctrine,

"diversion and application of water to a beneficial use constitute an appropriation, and entitle the

appropriator to a continuing right to use the water, to the extent of the appropriation, but not

beyond that reasonably required and actually used. The appropriator first in time is prior in right

over others upon the same stream." *Baley*, 942 F.3d at 1320 (quoting *Arizona v. California*, 298

U.S. 558, 565–66 (1936)). "[T]he doctrine provides that rights to water for irrigation are

perfected and enforced in order of seniority, starting with the first person to divert water from a

natural stream and apply it to a beneficial use[.]" *Id.* (citing *Montana v. Wyoming*, 563 U.S. 368,

375–76 (2011)). "Once such a water right is perfected, it is senior to any later appropriators'

rights and may be fulfilled entirely before those junior appropriators get any water at all." *Id.*

(citing *Montana v. Wyoming*, 563 U.S. at 376). In Oregon, "[a] junior appropriator's water right

cannot be exercised until the senior appropriator's right has been satisfied." *Benz v. Water Res.*

*Comm'n*, 94 Or. App. 73, 81, 764 P.2d 594, 599 (Or. Ct. App. 1988).

In 1909, the Oregon Legislature enacted the Water Rights Act ("Act") and codified the

prior appropriation doctrine.[2] Under the Act, "all waters within the state may be appropriated for

beneficial use, as provided in the Water Rights Act and not otherwise[.]" ORS § 537.120. With

few exceptions, "a person may not use, store or divert any waters until after the department

issues a permit to appropriate the waters." ORS § 537.130. The right to the use of water may be

subject to time and quantity limitations. *Rencken v. Young*, 300 Or. 352, 364, 711 P.2d 954, 960

n.10 (Or. 1985). When a senior appropriator makes a call on a water right, the Oregon Water

Resources Department ("OWRD") can validate the call and issue regulation orders to junior

appropriators with instructions to stop diverting water. *Buchanan v. Water Res. Dep't of Or.*, No.

1:23-CV-00923-CL, 2023 WL 5093879, at *5 (D. Or. Aug. 9, 2023); *see also Yurok Tribe*, 2023

WL 1785278, at *5 ("If the investigation reveals a valid complaint, the watermaster may begin to

regulate the water 'in accordance with the relative rights or rotation agreements of the

appropriators involved in the complaint or shortage.'" (quoting Or. Admin. R. 690-250-0100)).

### B.    Klamath Basin Adjudication

In 1975, the State of Oregon initiated the Klamath Basin Adjudication ("KBA") to

adjudicate the relative rights of use of the Klamath River and its tributaries in accordance with

Oregon's general stream adjudication law. *See* ORS § 539.005. "Oregon law required that all

parties file claims of water rights and subjected contested claims to an administrative review

conducted by [OWRD] and then judicial review conducted by the county circuit court." *Klamath*

---

[2] The Act preserved water rights acquired through beneficial use prior to 1909: "[N]othing contained in the Water Rights Act shall be so construed as to take away or impair the vested right of any person to any water or to the use of any water." ORS § 537.120; *see also* ORS § 539.010. Water rights acquired before February 24, 1909, are called "undetermined vested rights." ORS § 536.007(11).

*Irrigation Dist.*, 48 F.4th at 941 (citing ORS §§ 539.021, 539.100, 539.130). "Any person owning any irrigation works, or claiming any interest in the stream involved in the determination shall be a party to, and bound by, the adjudication." ORS § 539.100. Claims were filed beginning in 1990, and administrative hearings were initiated in 2001. *Baley*, 134 Fed. Cl. at 635.

In 2013, the Adjudicator issued findings of fact and an order of determination, and, in 2014, the Adjudicator submitted the Amended Corrected Findings of Fact and Order of Determination ("ACFFOD") to the Klamath County Circuit Court. *See* ACFFOD, In the Matter of the Determination of the Relative Rights to Use of the Water of the Klamath River and Its Tributaries, Or. Water Res. Dept. (Feb. 28, 2014).[3] In accordance with ORS § 539.150, the Klamath County Circuit Court is currently managing hearings to approve or modify the ACFFOD. *Klamath Irrigation Dist.*, 48 F.4th at 941. "While the court holds these hearings, the ACFFOD regulates water use in the Klamath Basin." *Id.* (citing ORS §§ 539.130, 539.170).

The ACFFOD recognized that the United States "holds a legal interest in the water right for the purpose of re-use of return flows" and "holds a separate right for storage of water in [UKL] for the benefit of the irrigation rights recognized in [the ACFFOD]."[4] *See* White Decl., Ex. 13 at 7083, ECF No. 61-13.[5] The ACFFOD also quantified the Klamath Tribes' water and fishing rights and established minimum elevation levels required to be maintained at UKL. *See Buchanan*, 2023 WL 5093879, at *3–4 (discussing the Klamath Tribes' water and fishing rights). The Klamath Tribes' rights have a priority date of time immemorial. *Id.*

---

[3] The ACFFOD can be found at
https://www.oregon.gov/owrd/programs/WaterRights/Adjudications/KlamathRiverBasinAdj/Pages/ACFFOD.aspx
(last visited Aug. 27, 2023).

[4] Under the ACFFOD, "return flows" mean "water that has been diverted and applied to land in the project, but not consumptively used by crops[.]" ACFFOD 7083 n.45.

[5] The Court uses the last three or four digits of a document's Bates number.

## IV.    The Present Dispute

### A.    Klamath Drainage District

KDD's beginnings can be traced to homesteaders who settled around Lower Klamath Lake and adjacent wetlands in the 1880s. Declaration of Scott White ("White Decl.") ¶ 21, ECF No. 61. In 1915, KDD was formed pursuant to Oregon state law. *Id.* ¶ 8. Today, irrigators within KDD's boundaries grow barley, wheat, potatoes, alfalfa, hay, and other crops. *Id.* ¶ 9. KDD also facilitates water deliveries to the Lower Klamath Wildlife Refuge. *Id.* ¶ 15.

In the stretch of the Klamath River between Link River Dam and Iron Gate Dam, KDD has two points of diversion: the North Canal and the Ady Canal. *See* Heck Decl. ¶ 5, ECF No. 65. KDD owns and operates the Ady Canal, but Reclamation asserts ownership over its outer headgates. *See* White Decl. ¶ 12, ECF No. 61. Reclamation can close the headgates of the Ady Canal, preventing KDD, if necessary, from diverting water from the Klamath River at that location. *See* Heck Decl. ¶ 5, ECF No. 65. KDD also owns and controls the North Canal and its headgates. *See* White Decl. ¶ 10, ECF No. 61. Reclamation does not have the capability to prevent KDD from diverting water through the North Canal. *See* Heck Decl. ¶ 5, ECF No. 65.

In 1917, KDD entered into its first contract with the United States. *See* Heck Decl., Ex. B, ECF No. 65-2 ("1917 Contract"). In the 1917 Contract, the United States agreed to assist KDD in reclaiming lands for farming by closing certain gates at the Klamath Strait, a waterway connecting the Klamath River to Lower Klamath Lake. *See id.*, Art. 7. In exchange, KDD agreed to pay the United States part of the cost of reclaiming the land within KDD's boundaries. *See id.*, Art. 6.

In 1921, KDD further contracted with the United States to "secure from the United States a water right for the lands of [KDD.]" Heck Decl., Ex. C, Art. 4, ECF No. 65-3 ("1921

Contract"). The United States agreed to "deliver to the District during the irrigation season each

year ... a sufficient quantity of water for the irrigation of the irrigable lands of the District, not

exceeding 27500 acres." *Id.*, Art. 5. The diversion point designated for KDD's supply in the

1921 Contract is now known as the Ady Canal. *See id.* In exchange, KDD agreed to pay "an

operation and maintenance charge" to cover Reclamation's costs of operating the Klamath

Project and providing KDD with water. *Id.*, Art. 8(c).

### B.    1943 Contract

In 1943, the parties entered into the currently operative contract (the "1943 Contract"),

which superseded the 1921 Contract. *See* Heck Decl., Ex. A, ECF No. 65-1 ("1943 Contract").

The parties' dispute centers on two articles of the 1943 Contract: Articles 14 and 35.

First, Article 14 is titled "Delivery of Water by the United States." *Id.*, Art. 14. Article

14(a) provides:

> The United States agrees that, subject to the provisions of the Act
> of February 21, 1911 (36 Stat. 925), known as the Warren Act, and
> particularly Section 2 thereof, it will deliver to the District during
> the irrigation season of each year at the gates installed in the
> railroad embankment near Ady, Oregon, ... a supply of water out of
> storage in Upper Klamath Lake and from the natural flow of
> Klamath River. For the purposes of this contract, the irrigation
> season is the period from April 15 to September 30, inclusive, of
> each year. The amount of water to be delivered in any season shall
> not be in excess of the amount that can be used beneficially for the
> irrigation of lands in the District in cultivation in that season, and
> in no event to exceed the amount that can be used beneficially for
> 27,500 acres of irrigable lands within the District boundaries. ... In
> the event of a shortage of water in any irrigation season there shall
> be a proration of the supply from the sources above named
> between the District and others supplied therefrom in a manner
> deemed equitable by the Secretary.

1943 Contract, Art. 14(a). Additionally, Article 14(c) provides:

> The delivery of water to the District, as provided in this article,
> shall be made at such times and in such quantities (compatible with

the operation of the project works in connection with the handling
and disposition of water to others) as may be arranged between the
appropriate representative of the District and the officer of the
United States in charge of the Klamath Project.

*Id.*, Art. 14(c). Under the 1943 Contract, "shortage of water" includes "drought, canal breaks,

inaccuracy in distribution[,] or other causes[.]" *Id.*, Art. 24.[6]

Second, Article 35 is titled "Rules and Regulations" and provides:

The United States, acting for this purpose through the Secretary,
reserves the right, so far as the purport thereof may be consistent
with the provisions of this contract, to make reasonable rules and
regulations, and to add to or modify them as the Secretary may
deem proper and necessary to carry out the true intent and meaning
of the law and of this contract and to supply necessary details of
their administration; and the District agrees to observe such rules
and regulations.

*Id.*, Art. 35.

C.    **1977 Water Permit**

In 1977, KDD applied for and was granted a Permit to Appropriate Public Waters of the

State of Oregon ("1977 Water Permit") from OWRD. *See* White Decl., Ex. 6, ECF No. 61-6

("1977 Water Permit"). KDD applied "for the use of water ... for normal irrigation from April 15

to September 30" and stated that the requested right would be "supplemental to the rights of the

Klamath Project, U.S. Bureau of Reclamation." *Id.* at 924. The 1977 Water Permit's priority date

is April 25, 1977. *Id.* at 925. If fully exercised, the 1977 Water Right allows KDD to divert up to

57,702.9 acre-feet ("AF") of water per year. *See* White Decl. ¶ 47, ECF No. 61.

In March 1978, Reclamation sent KDD a letter stating that it was Reclamation's policy

"to examine all applications filed with [OWRD] for the appropriation of water in the Klamath

River Basin that could possibly affect the Klamath Project." *See* Second Declaration of Aaron D.

---

[6] KDD, for the purpose of its motion, "assumes there was a shortage in 2022 within the meaning of the 1943
Contract." Def.'s Mot. 47 n.25, ECF No. 60.

Lebenta ("Second Lebenta Decl."), Ex. C, ECF No. 79-3. Reclamation further stated that the

letter's purpose "is to give [KDD] notice that the United States claims a water right with a

priority date of 1905." *Id.* Reclamation advised KDD that its "permit will be junior in priority to

all other rights on the Klamath River and on the Klamath River downstream from [KDD's] point

of diversion, existing before the date of [KDD's application]." *Id.* Lastly, Reclamation noted

that, "[b]ecause of the junior status of [KDD's] permit, during years of low runoff, the water

available to [KDD] might be less than the amount stated in [KDD's] permit." *Id.*

      Between 2010 and 2012, Reclamation acknowledged KDD's use of its 1977 Permit

outside of Reclamation's Project allocations. *See* Pl.'s Reply 20, ECF No. 88. In June 2010,

Reclamation informed KDD that water provided to the Lower Klamath Wildlife Refuge because

of a "dike breach" would be considered "non-project water ... delivered under [KDD's] State

Water Right and [would] not be accounted as Project Water to the Refuge." White Decl., Ex. 9,

ECF No. 61-9. In December 2010, Reclamation informed KDD that Reclamation had "not

determined that water is available for Klamath Project purposes" and advised KDD that "any

water currently being delivered shall be considered as water under [KDD's] State Water

Permit[.]" *Id.*, Ex. 10, ECF No. 61-10.

      In April 2012, Reclamation notified KDD that "recent issues regarding diversion and use

of Klamath River water in KDD, and the status of KDD's Permit, prompted the Bureau of

Reclamation to request clarification from [OWRD] regarding the nature of KDD's Permit." *Id.*,

Ex. 11, ECF No. 61-11. Reclamation attached OWRD's clarification letter and described it as

"stat[ing] that the KDD's Permit is the primary right for irrigation within the District, and the

Project water supply is considered secondary, or supplemental." *Id.* Reclamation then advised

KDD that, "[f]rom this point forward, Reclamation will consider water diverted for use on lands

identified in KDD's Permit, as water diverted under the permit." *Id.* Reclamation also notified

KDD that "Project water will only be made available to KDD after KDD has fully utilized all

water available under the Permit, and if Reclamation determines Project water supplies are

available." *Id.* In September 2012, Reclamation expressed its "expect[ation] that KDD will

continue to divert water under its primary, state water diversion permit" during the non-irrigation

season. *Id.*, Ex. 12, ECF No. 61-12.

Reclamation's 2012 Drought Plan noted that "KDD also has an Oregon State permit to

appropriate waters (Permit No. 43334) for beneficial use[.]" Declaration of Aaron D. Lebenta

("Lebenta Decl."), Ex. E at 6, ECF No. 62-5.[7] The 2012 Drought Plan also stated:

> In the event of a water shortage and/or drought declaration, a
> contractor who has a contract with Reclamation under the Warren
> Act (February 21, 1911 (36 Stat., 925)) and has another primary
> surface water supply available (i.e., state water right claim or
> permit), will use that primary supply in lieu of Project surface
> water.

*Id.* at 3. The 2012 Drought Plan described these diversions as "Non-Project Diversions." *Id.*

Beginning in 2014, Reclamation objected to KDD's water diversions outside of

Reclamation's Project allocation. *See, e.g.*, Declaration of Crystal Johnson Geise ("Geise

Decl."), Ex. 10, ECF No. 76-10. In 2014, KDD did not report any diversions under its 1977

Water Permit to OWRD. *See* White Decl., Exs. 7–8, ECF No. 61. In April 2015, Reclamation

informed KDD that "it is evident that a fundamental disagreement exists as to how the *1905*

*Klamath Project* water right and KDD's junior state permit can be exercised in light of the terms

of the 1943 contract and the use of Project water, especially under current drought conditions."

---

[7] KDD requests that the Court take judicial notice of Exhibits E, J, K, L, M, N, and O to the Lebenta Declaration.
*See* Def.'s Mot. Judicial Notice, ECF No. 63. Plaintiff "does not oppose the Court's consideration of any of the
documents at issue in KDD's Motion for Judicial Notice for appropriate purposes." Pl.'s Resp. 2, ECF No. 71. As
such, KDD's motion is granted.

Geise Decl., Ex. 12 at 612, ECF No. 76-12 (emphasis in original). Reclamation advised KDD that its "position ... has not changed" that "KDD has a contractual right to, and is therefore entitled to, no more than its share of the volume of water determined available to all *Warren Act* contractors based on the net *Klamath Project* supply each year." *Id.* (emphasis in original). Reclamation also acknowledged that "KDD is expressing its disagreement with that position by ... diver[ting] approximately 23,081.16 [AF]." *Id.* at 613. In its 2015 Drought Plan, Reclamation noted that KDD's diversions were "in excess of [KDD's] allocation[.]" Geise Decl., Ex. 13 at 1, ECF No. 76-13. However, Reclamation explained that because it did not "currently have a means to limit diversions by KDD, other than by directing compliance with its contract, Reclamation must take KDD's anticipated excess diversions into account in determining the volume of Project Supply it can reasonable expect to be able to deliver to the other Project contractors." *Id.* at 1–2.

The parties' disagreement continued into subsequent years.[8] In 2018, Reclamation reiterated that the parties "fundamentally disagreed about how Project water rights ... along with KDD's junior state permit (Permit No. 43334) can be exercised in accordance with the terms of the 1943 contract between KDD and Reclamation." Geise Decl., Ex. 4 at 635, ECF No. 76-4. KDD nevertheless informed Reclamation that it planned to divert around 28,851.6 AF. *See id.* at 636. In 2018, KDD again did not report any diversions under its 1977 Water Permit to OWRD. *See* White Decl., Exs. 7–8, ECF No. 61. As a result, in its 2018 Drought Plan, Reclamation noted that KDD's unauthorized diversions forced Reclamation to "take KDD's anticipated excess

---

[8] KDD argues that Plaintiff "should be precluded from relying on pre-2022 evidence based on its discovery conduct in this case." Def.'s Reply 9, ECF No. 84. However, KDD relies on pre-2022 evidence in multiple sections of its motion. *See, e.g.,* Def.'s Mot. 11–15, ECF No. 60. KDD cannot both rely on pre-2022 evidence and preclude Plaintiff from using pre-2022 evidence. KDD's request is denied.

diversions into account in determining the volume of Project Supply it can reasonably expect to be able to deliver to the other Project contractors." *Id.* at 630.

In April 2021, Reclamation issued its 2021 Operations Plan and notified Project contractors that only 33,000 AF of water would be available for the irrigation season. Second Declaration of Alan C. Heck ("Second Heck Decl."), Ex. A at 768–69, ECF No. 73-1. Reclamation instructed irrigators that water would not be available prior to May 15, 2021. *Id.* at 768. Despite Reclamation's instructions, KDD began diverting water under its 1977 Water Permit within two days of Reclamation releasing the 2021 Operations Plan. *See* Geise Decl., Exs. 14–15, ECF No. 76. In 2021, KDD reported to OWRD that it diverted 23,620 AF of water from the North Canal pursuant to its 1977 Water Permit. *See* White Decl., Ex. 7, ECF No. 61-7. By Reclamation's estimates, KDD's diversions amounted to the entire available Project water supply for that irrigation season. *See* Second Heck Decl. ¶ 5, ECF No. 73. In response to KDD's diversions, Reclamation either reduced or eliminated the water allocation for other Project contractors in 2018 and 2021. *See id.*; Geise Decl., Ex. 4 at 635, ECF No. 76-4.

**D.    Water Year 2022**

In April 2022, Reclamation issued its 2022 Operations Plan ("Operations Plan") based on forecasts of severe drought conditions. *See* Heck Decl., Ex. F at 754, ECF No. 65-6. In the Operations Plan, Reclamation explained that the "Plan necessarily reflects and accounts for the ongoing extreme drought conditions for the third consecutive year afflicting the Klamath Basin." *Id.* at 756. Reclamation "determined that hydrologic conditions are currently preventing and will continue to prevent Reclamation from operating the Project" consistent with its obligations to ESA-listed species under the 2020 U.S. Fish and Wildlife Service biological opinion ("2020

USFWS BiOp") and the 2019 National Marine Fisheries Service biological opinion ("2019

NMFS BiOp"). *Id.* With respect to irrigation diversions, Reclamation determined:

> As a result of the historically dry hydrologic conditions, competing
> needs and multiple federal legal requirements, Reclamation has
> determined that the Project Supply allocation from UKL and the
> Klamath River for the 2022 spring/summer irrigation season will
> be insufficient to provide full deliveries to Repayment and
> Settlement Contractors ("A" Contractors) and at this time no water
> will be available for other Project contractors.

*Id.* at 757. Reclamation planned to allocate "approximately up to 62,000 AF as a result of

projected hydrologic conditions[.]" *Id.* at 759.

In late April 2022, Reclamation issued its 2022 Drought Plan ("Drought Plan"). *See* Heck

Decl., Ex. G at 745, ECF No. 65-7. In the Drought Plan, Reclamation informed all interested

parties, including KDD, that only 62,000 AF of water were available for Project contractors. *Id.*

at 750.[9] Reclamation explained that, "[i]n the event of a shortage in Project Supply, Reclamation

determines the allocation of the available supply in accordance with the terms of the contracts

between Reclamation and districts and individual water users" and "implements the provisions in

these contracts that create priorities among the four types of contracts within the Project." *Id.* at

748. Reclamation specifically noted that KDD's contract "is an example of a Warren Act

contract." *Id.* Out of the 62,000 AF, Reclamation thus allocated: 16,433 AF for Van Brimmer;

17,862 AF for KID; and 27,705 AF for TID. *Id.* at 750. Reclamation repeatedly directed KDD

not to divert any water during the 2022 irrigation season. *See, e.g.*, Heck Decl., Ex. H, ECF No.

65-8 (May 2022); *id.*, Ex. I, ECF No. 65-9 (June 2022).

---

[9] The Klamath Tribes challenged Reclamation's decision to allocate 62,000 AF of water to Project contractors in 2022. The Court addresses the parties' summary judgment motions in a concurrently filed Findings and Recommendation. *See Klamath Tribes v. U.S. Bureau of Reclamation, et al.*, No. 1:22-cv-00680-CL (D. Or. filed May 9, 2022).

It is undisputed that KDD received Reclamation's instructions and proceeded to divert water. *See* Deposition of Scott White ("White Dep.") 54:7–10, ECF No. 66-2. By Reclamation's measurements, KDD diverted over 28,000 AF. *See* Declaration of Thomas Dietrich Hill ("Hill Decl."), Ex. E at 4, ECF No. 66-5. By KDD's measurements, it diverted over 13,000 AF. *See id.*, Ex. D at 4, ECF No. 66-4. KDD cited its 1977 Water Permit in its communication with Reclamation regarding its continued diversions. *See id.*, Ex. H, ECF No. 66-8. Because KDD diverted water from the Klamath River between Link River Dam and Iron Gate Dam, Reclamation released additional water from Link River Dam to keep flows at Iron Gate Dam above the minimum flows necessary to comply with the 2019 NMFS BiOp. *See* Heck Decl. ¶ 23, ECF No. 65. These additional releases contributed to lower elevations in UKL and diminished the available habitat for endangered suckers. *Id.* To prevent further harm to the suckers, Reclamation instructed KID and TID to cease diverting water from UKL. *Id.*

## LEGAL STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the non-moving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings

and identify facts which show a genuine issue for trial. *Id.* at 324. "Where the parties file cross-motions for summary judgment, the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (citing *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001)). Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630.

"In a contract dispute, '[s]ummary judgment is appropriate when the contract terms are clear and unambiguous, even if the parties disagree as to their meaning.'" *United Bhd. of Carpenters & Joiners of Am., Lathers Loc. 42-L v. United Bhd. of Carpenters & Joiners of Am.*, 73 F.3d 958, 961 (9th Cir. 1996) (quoting *United States v. King Features Entertainment, Inc.*, 843 F.2d 394, 398 (9th Cir. 1988)) (alteration in original).

## DISCUSSION

"One of the most contentious issues in the western United States is the management of water resources." *Westlands Water Dist. v. United States*, 337 F.3d 1092, 1100 (9th Cir. 2003) (citation omitted). The Court begins by addressing mootness before turning to the merits of the parties' motions. For the reasons that follow, Plaintiff's Motion for Summary Judgment is GRANTED and Defendant's Motion for Summary Judgment is DENIED.

## I.    Mootness

As a preliminary matter, KDD argues Plaintiff's claims are moot because the 2022 Operations Plan and 2022 Drought Plan (collectively, "2022 Plans") are no longer in effect. *See* Def.'s Mot. 26–32, ECF No. 60. Plaintiff argues its claims fall within the "capable of repetition, yet evading review" exception to mootness. Pl.'s Resp. 22–29, ECF No. 72. KDD argues

Plaintiff's claims do not fall within this exception because any future plans will be separate and discrete actions. *See* Def.'s Mot. 30, ECF No. 60.

A federal court has no authority "to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (citation omitted). "[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) (citing *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (citations omitted). The central question of a mootness challenge is "not whether the precise relief sought at the time the [action] was filed is still available," but "whether there can be any effective relief." *West v. Sec'y of Dep't of Transp.*, 206 F.3d 920, 925 (9th Cir. 2000) (quotation marks omitted). The party asserting mootness carries the "heavy burden" of demonstrating that the controversy is moot. *Adarand Constr., Inc. v. Slater*, 528 U.S. 216, 222 (2000) (quotation marks omitted).

An exception to mootness exists for cases that are "capable of repetition, yet evading review." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 170 (2016). This exception "applies only in exceptional situations, where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Id.* (alterations and quotation marks omitted).

The "capable of repetition, yet evading review" exception to mootness applies here. First, the duration of the 2022 Plans was too short to be fully litigated prior to their expiration.[10]

---

[10] KDD does not dispute this. *See* Def.'s Mot. 30, ECF No. 60.

Reclamation's operation of the Klamath Project pursuant to the 2022 Plans occurred for less than a year and ended on September 30, 2022. "[A] period of two years is too short to complete judicial review[.]" *Kingdomware Techs.*, 579 U.S. at 170.

Second, there is a reasonable expectation that the United States will be subject to the same action again. Recurring drought conditions will remain a "brooding presence" over the Klamath Basin in the foreseeable future. *Nat. Res. Def. Council v. McCarthy*, 231 F. Supp. 3d 491, 497 (N.D. Cal. 2017) (quoting *Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*, 893 F.2d 1012, 1015 (9th Cir. 1989)). "From 2000 through 2022, the [western United States] faced the driest 23-year period in more than a century and one of the driest periods in the last 1,200 years. And the situation is expected to grow more severe in future years." *Arizona v. Navajo Nation*, 143 S. Ct. 1804, 1811 (2023). Contrary to KDD's arguments, Reclamation need not adopt identical plans in the future for there to be a reasonable expectation that Plaintiff will be subject to the same action again. Here, given the history between the parties, there remains a reasonable expectation that KDD will divert water during drought years when Reclamation instructs KDD not to divert any water. *See Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1174 (9th Cir. 2002) (finding a controversy capable of repetition where there is "a reasonable expectation that [the parties] will again litigate the issue"). As such, Plaintiff's claims fall within the "capable of repetition, yet evading review" exception to mootness.

## II.    Breach of Contract

Plaintiff argues KDD breached two independent obligations under the 1943 Contract. *See* Pl.'s Mot. 14, ECF No. 64. First, Plaintiff argues KDD breached Article 14 because that article imposes an enforceable obligation on KDD to take water only as agreed upon with the United States, including when a water allocation is prorated to zero in years of shortage. *See id.* at 16. Second, Plaintiff argues KDD breached Article 35 by failing to follow the 2022 Plans, which Plaintiff contends are "rules and regulations" within the meaning of the 1943 Contract. *Id.* at 17.

With respect to KDD's 1977 Water Permit, Plaintiff asserts that the 1943 Contract "prohibits diversions from the Klamath River not authorized by Reclamation regardless of whether those diversions would otherwise be permissible, so the [1977 Water] Permit is irrelevant." *Id.* at 20. Plaintiff emphasizes that allowing KDD to divert water pursuant to its 1977 Water Permit would render parts of the 1943 Contract a nullity. *See id.* at 16.

KDD argues the 2022 Plans are not enforceable "rules and regulations" under Article 35. Specifically, KDD argues: (1) the 2022 Plans are invalid because they fail to comply with the notice-and-comment requirements of the Administrative Procedure Act ("APA"); (2) the 2022 Plans are not rules and regulations of the Secretary or her authorized delegee because they fail to comply with departmental procedures; and (3) incorporating the 2022 Plans would constitute a unilateral amendment of the 1943 Contract. *See* Def.'s Mot. 33–43, ECF No. 60. As to Article 14, KDD argues that an allocation of zero AF is not equitable, and that KDD should not be grouped together with other Warren Act contractors. *See id.* at 44–51. Lastly, KDD asserts that its 1977 Water Permit is not subject to federal control. *See id.* at 51–55.

Federal common law governs the interpretation of contracts to which the United States is a party. *Westlands Water Dist.*, 337 F.3d at 1100; *Mohave Valley Irrigation & Drainage Dist. v. Norton*, 244 F.3d 1164, 1165 (9th Cir. 2001). "To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989) (citations omitted). For guidance, a court may look to general principles for interpreting contracts. *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir. 1989). "The Uniform Commercial Code is a source of federal common law and may be relied upon in interpreting a

contract to which the federal government is a party." *O'Neill v. United States*, 50 F.3d 677, 684

(9th Cir. 1995). Courts may also look to the Restatement of Contracts when deciding questions

of federal common law related to contracts. *See Pauma Band of Luiseño Mission Indians of*

*Pauma & Yuima Reservation v. California*, 813 F.3d 1155, 1163 (9th Cir. 2015).

"A written contract must be read as a whole and every part interpreted with reference to

the whole." *Kennewick Irrigation*, 880 F.2d at 1032 (citation omitted). "Preference must be

given to reasonable interpretations as opposed to those that are unreasonable, or that would make

the contract illusory." *Id.* (citation omitted). "Contract terms are to be given their ordinary

meaning, and when the terms of a contract are clear, the intent of the parties must be ascertained

from the contract itself." *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206,

1210 (9th Cir. 1999), *opinion amended on denial of reh'g*, 203 F.3d 1175 (9th Cir. 2000)

(citation omitted). "Whenever possible, the plain language of the contract should be considered

first." *Id.* (citation omitted). "The fact that the parties dispute a contract's meaning does not

establish that the contract is ambiguous; it is only ambiguous if reasonable people could find its

terms susceptible to more than one interpretation." *Id.* (citing *Kennewick Irrigation*, 880 F.2d at

1032). To determine whether a contract is ambiguous, a court may consider evidence of course

of dealing, trade usage, or course of performance. *See Mohave Valley*, 244 F.3d at 1166 (citing

UCC § 2–202).

The issues presented in this case boil down to two main questions. The first question is

whether Plaintiff can allocate KDD zero AF out of 27,500 AF under the terms of the 1943

Contract. The second question is whether the terms of the 1943 Contract and KDD's status as a

Project contractor preclude KDD from diverting water pursuant to the 1977 Water Permit. The

Court will address each question in turn.

24 – Opinion and Order

**A.   Plaintiff can allocate KDD zero AF out of the 27,500 AF maximum amount mentioned in the 1943 Contract.**

First, KDD argues that the 2022 Plans are not enforceable "rules and regulations" under Article 35. Specifically, KDD argues: (1) the 2022 Plans are invalid because they fail to comply with the notice-and-comment requirements of the APA; (2) the 2022 Plans are not rules and regulations of the Secretary or her authorized delegee because they fail to comply with departmental procedures; and (3) incorporating the 2022 Plans would constitute a unilateral amendment of the 1943 Contract. *See* Def.'s Mot. 33–43, ECF No. 60. Second, as to Article 14, KDD argues that it should not be grouped together with other Warren Act contractors, and that an allocation of zero AF is not equitable. *See id.* at 44–51.

   1.   Article 35

Under Article 35 of the 1943 Contract, Plaintiff reserved the right "to make reasonable rules and regulations, and to add to or modify them as the Secretary may deem proper and necessary to carry out the true intent and meaning of the law and of this contract and to supply necessary details of their administration[.]" 1943 Contract, Art. 35. KDD agreed "to observe such rules and regulations." *Id.*

The 2022 Plans qualify as "rules and regulations" under the common usage of those words. "In interpreting contractual terms under federal common law, [a court] give[s] effect to the parties' intention as ascertained from the terms themselves." *Schroeder v. United States*, 569 F.3d 956, 961 (9th Cir. 2009) (citation omitted); *see also Kemmis v. McGoldrick*, 767 F.2d 594, 597 (9th Cir. 1985) ("If a provision is ambiguous, ... its interpretation depends on the parties' intent at the time of execution." (citation omitted)). At the time the parties entered into the 1943 Contract, a "rule" was understood as "[a]n established standard, guide, or regulation; a principle or regulation set up by authority, prescribing action or forbearance," Rule, BLACK'S LAW

DICTIONARY 1570 (3d ed. 1933), and a "regulation" was understood as "a rule or order prescribed for management or government; a regulating principle; a precept." Regulation, BLACK'S LAW DICTIONARY 1519 (3d ed. 1933).[11] The "rules and regulations" term is unambiguous.

The 2022 Plans are rules and regulations under the plain language of the 1943 Contract. The 1943 Contract was made pursuant to the Reclamation Act of 1902 (the "Act"). *See* Heck Decl., Ex. A, ECF No. 65-1. Section 10 of the Act authorizes Plaintiff "to perform any and all acts and to make such rules and regulations as may be necessary and proper for the purpose of carrying out the provision of this Act into full force and effect." 43 U.S.C. § 373. This section "expressly grants broad rulemaking authority to [the Department of the Interior] in connection with reclamation projects." *United States v. Alpine Land & Reservoir Co.*, 887 F.2d 207, 212 (9th Cir. 1989); *see also Yurok Tribe*, 2023 WL 1785278, at *17 ("Congress gave [Reclamation] a broad mandate in carrying out the Reclamation Act, meaning it has discretion in deciding how to do so.").[12] Reclamation developed the 2022 Plans specifically to address severe drought conditions in the Klamath Basin. Reclamation's obligations to ESA-listed species in UKL and the Klamath River required Reclamation to adaptively manage the situation. As such, the 2022 Plans are certainly within Reclamation's discretion and broad rulemaking authority under the Act.

Contrary to KDD's arguments, the APA is not relevant to the "rules and regulations" term under Article 35. "[T]he fundamental goal of contract interpretation is to give effect to the

---

[11] These definitions are consistent with modern legal definitions. *See* Rule, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Generally, an established and authoritative standard or principle; a general norm mandating or guiding conduct or action in a given type of situation."); *see also* Regulation, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Control over something by rule or restriction[.]").

[12] "KDD recognizes that the Secretary has broad rulemaking authority under the Reclamation Act." Def.'s Mot. 34, ECF No. 60 (citing 43 U.S.C. § 373).

mutual intent of the parties *as it existed at the time* of contracting." *Pauma Band of Luiseño Mission Indians*, 813 F.3d at 1165 (quoting *U.S. Cellular Inv. Co. v. GTE Mobilnet, Inc.*, 281 F.3d 929, 934 (9th Cir. 2002)) (emphasis and alteration in original). The 1943 Contract predates the APA by three years. *See* Pub. L. No. 79-404, 60 Stat. 237 (1946). Absent an explicit reference to future regulations, a government contract is not necessarily subject to future regulations promulgated under new statutes. *See Mobil Oil Expl. & Producing Se., Inc. v. United States*, 530 U.S. 604, 616 (2000). Here, the APA's procedural requirements did not exist at the time the parties entered into the 1943 Contract. Even if the APA were relevant, the APA's procedural requirements do not apply "to the extent that there is involved ... a matter relating to ... contracts." 5 U.S.C. § 553(a)(2). In other words, any "rules and regulations" within the scope of the Article 35 are not subject to the APA's requirements.

Additionally, the 2022 Plans underwent all necessary approvals. Citing Article 37, KDD argues that the 2022 Plans "were not made or issued by the Secretary, as required to trigger Article 35" because the 2022 Plans were prepared by the Klamath Basin Area Office ("KBAO") and no written approval was provided by any higher level of authority within Reclamation. Def.'s Mot. 35, ECF No. 60. Article 37 provides: "Where this contract provides for action by the Secretary, said action may be taken for and on behalf of the Secretary by his representative duly authorized in writing by him." 1943 Contract, Art. 37. Under applicable departmental guidelines, the Secretary's authority may be delegated to the Assistant Secretary of Water and Science, who can then delegate that authority to the Commissioner of Reclamation. *See* Lebenta Decl., Ex. L, ECF No. 62-12; Geise Decl., Exs. 19–21, ECF No. 76. These are written delegations. Here, the Commissioner of Reclamation approved the 2022 Operations Plan and the continuation of

Reclamation's priority-based allocation to Project contractors. *See* Declaration of David

Palumbo ("Palumbo Decl.") ¶ 4, 6, ECF No. 74.[13]

Finally, Reclamation's issuance of the 2022 Plans does not constitute a unilateral

amendment because the 1943 Contract expressly contemplates such rules and regulations. "A

party can't unilaterally change the terms of a contract; it must obtain the other party's consent

before doing so." *Douglas v. U.S. Dist. Court, Cent. Dist. of Cal.*, 495 F.3d 1062, 1066 (9th Cir.

2007) (citation omitted). Here, however, Plaintiff "reserve[d] the right ... to make reasonable

rules and regulations, and to add to or modify them as the Secretary may deem proper and

necessary to carry out the true intent and meaning of the law and of this contract." 1943

Contract, Art. 35. The District "agree[d] to observe such rules and regulations." *Id.* Simply put,

there was no unilateral amendment of the contract here. The 2022 Plans are rules and regulations

within the meaning of Article 35.

### 2. Article 14

Under Article 14, Plaintiff agreed to "deliver to [KDD] during the irrigation season ... a

supply of water out of storage in [UKL] and from the natural flow of Klamath River." 1943

Contract, Art. 14(a). The 1943 Contract provided that "[t]he amount of water to be delivered in

any season shall not be in excess of the amount that can be used beneficially for the irrigation of

lands in the District in cultivation in that season, and in no event to exceed the amount that can

be used beneficially for 27,500 acres of irrigable lands within the District boundaries." *Id.* The

---

[13] KDD takes issue with Plaintiff's alleged failure to disclose David Palumbo's testimony prior to filing its response.
*See* Def.'s Reply 30, ECF No. 84. The Court agrees with Plaintiff that submission of Palumbo's declaration was
timely and proper given that KDD, in its motion for summary judgment, raised for the first time the issue of whether
the 2022 Plans were approved at the appropriate levels. *See* Pl.'s Sur-Reply 2, ECF No. 92. KDD's general inquiries
as to who approved the 2022 Plans were not sufficient to put Plaintiff on notice of the issue raised in KDD's motion.
*See* Def.'s Reply 5–9, ECF No. 84. Additionally, KDD alleges Palumbo's declaration contradicts the testimony of
Alan Heck. *See id.* at 30. The Court has reviewed Palumbo's declaration and Heck's testimony and finds no
contradictions. The Court thus denies KDD's request to "strike or disregard" Palumbo's declaration.

1943 Contract also provided that "[i]n the event of a shortage of water in any irrigation season there shall be a proration of the supply from the sources above named between the District and others supplied therefrom in a manner deemed equitable by the Secretary." *Id.* The plain language of the 1943 Contract gives Plaintiff the discretion, in the event of a shortage, to prorate water in a manner it deems equitable. In other words, Plaintiff may exercise its discretion to allocate KDD no water out of the 27,500 AF maximum mentioned in the 1943 Contract. These terms are clear and unambiguous. *See Patterson*, 204 F.3d at 1210 ("The fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous[.]").

KDD emphasizes its contract was made under Section 2 of the Warren Act, meaning KDD is entitled to receive at least some of the water that went to Van Brimmer, TID, and KID during 2022. *See* Def.'s Mot. 50, ECF No. 60.[14] In 1911, Congress passed the Warren Act, "authorizing the Secretary to sell surplus water to non-project irrigators and to contract with private irrigation companies for water delivery." *Minidoka Irrigation Dist. v. U.S. Dep't of Interior*, 406 F.3d 567, 570 (9th Cir. 2005). However, nothing in the 1943 Contract suggests that KDD has priority over Section 1 Warren Act contracts, or that KDD has the same priority as settlement contracts and repayment contracts. "A court cannot, under the guise of construction, add words to a contract, which would impermissibly re-write that contract." *Westland Water Dist. v. United States*, 153 F. Supp. 2d 1133, 1162 (E.D. Cal. 2001) (citing *McConnell v. Pickering Lumber Corp.*, 217 F.2d 44, 47 (9th Cir. 1954)). Moreover, TID's contract expressly states that its rights to water from the Project are "prior to those rights conferred by contracts executed under ... the Warren Act." Geise Decl., Ex. 2 at Arts. 33(b)–(c), ECF No. 76-2. Both KID and TID have repayment contracts. Even if Reclamation treated KDD's contract as distinct

---

[14] Under Section 1, the Secretary "preserv[es] a first right to lands and entrymen under the project[.]" 43 U.S.C § 523. No such language is found in Section 2. *See* 43 U.S.C § 524.

from Section 1 Warren Act contracts, Reclamation would still need to prioritize repayment

contracts before being able to allocate any water to KDD. Stated differently, the plain language

of the repayment contract gives it priority over all Warren Act contracts—including KDD's

Section 2 Warren Act contract.

In sum, the terms of the 1943 Contract are clear and unambiguous. Plaintiff has the

authority to allocate KDD zero AF out of the 27,500 AF mentioned in the 1943 Contract.

**B.      The terms of the 1943 Contract and KDD's status as a Project contractor
         preclude KDD from diverting water pursuant to the 1977 Water Permit.**

Plaintiff asserts that the 1943 Contract "prohibits diversions from the Klamath River not

authorized by Reclamation regardless of whether those diversions would otherwise be

permissible[.]" Pl.'s Mot. 20, ECF No. 64. Plaintiff emphasizes that allowing KDD to divert

water pursuant to its 1977 Water Permit would render parts of the 1943 Contract a nullity. *See id.*

at 16. KDD argues Plaintiff cannot preclude KDD from diverting water pursuant to its 1977

Water Permit because: (1) the 1943 Contract does not contain any language preventing KDD

from obtaining, or diverting water pursuant to, separately authorized state water rights; (2) there

is no language in the 2022 Plans precluding any Project contractor from diverting water under a

separate water right; and (3) Section 8 of the Reclamation Act of 1902 precludes any attempt to

exercise federal control over state water rights. Def.'s Mot. 51–55, ECF No. 60.

Section 10 of the Act authorizes Plaintiff "to perform any and all acts and to make such

rules and regulations as may be necessary and proper for the purpose of carrying out the

provision of this Act into full force and effect." 43 U.S.C. § 373. "Section 8 of the Act, 43 U.S.C.

§ 383, incorporates the concept of 'federalism.'" *Alpine Land*, 887 F.2d at 212. As noted, Section

8 states:

> Nothing in this Act shall be construed as affecting or intended to
> affect or to in any way interfere with the laws of any State or
> Territory relating to the control, appropriation, use, or distribution
> of water used in irrigation, or any vested right acquired thereunder,
> and the Secretary of the Interior, in carrying out the provisions of
> this Act, shall proceed in conformity with such laws, and nothing
> herein shall in any way affect any right of any State or of the
> Federal Government or of any landowner, appropriator, or user of
> water in, to, or from any interstate stream or the waters thereof.

43 U.S.C. § 383. "[S]ection 8 sets forth standards that [Interior] is to follow when its activities

pursuant to [S]ection 10 affect the acquisition of water rights." *Alpine Land*, 887 F.2d at 212.

"The federalism provision provides that, notwithstanding any other provisions of the Act,

state law governs the acquisition, distribution, and use of reclamation project water, and vested

rights acquired thereunder, unless directly inconsistent with congressional directives." *Id.*

(citations omitted); *see also California v. United States*, 438 U.S. 645, 668 n.21 (1978) ("[S]tate

water law does not control in the distribution of reclamation water *if* inconsistent with other

congressional directives to the Secretary." (citations omitted; emphasis in original)). "The term

'congressional directive' mean[s] a preemptive federal statute." *Nat. Res. Def. Council v.

Houston*, 146 F.3d 1118, 1132 (9th Cir. 1998) (citing *United States v. California*, 694 F.2d 1171,

1176–77 (9th Cir. 1982)). Under the doctrine of conflict preemption, "state laws are preempted

when they conflict with federal law." *Arizona v. United States*, 567 U.S. 387, 399 (2012). "This

includes cases where compliance with both federal and state regulations is a physical

impossibility, and those instances where the challenged state law stands as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress[.]" *Id.* at 399–400

(internal citations and quotation marks omitted).

Congress enacted the ESA "to halt and reverse the trend toward species extinction,

whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978); *see also Alaska Oil &*

*Gas Ass'n v. Jewell*, 815 F.3d 544, 550–51 (9th Cir. 2016) ("The purpose of the ESA is to ensure the recovery of endangered and threatened species, not merely the survival of their existing numbers."). "[E]xamination of the language, history, and structure of the legislation under review here indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities." *Hill*, 437 U.S. at 174; *see also Yurok Tribe*, 2023 WL 1785278, at *14 ("The text and structure of the ESA make clear that Congress's purpose in enacting the ESA was to prioritize the preservation and recovery of endangered and threatened species."). "Even in circumstances where the ESA was passed well after the agreement, the legislation still applies as long as the federal agency retains some measure of control over the activity. Therefore, when an agency, such as Reclamation, decides to take action, the ESA generally applies to the contract." *Patterson*, 204 F.3d at 1213 (internal citations omitted). Reclamation must operate the Klamath Project in a manner consistent with its obligations under the ESA. *Klamath Irrigation Dist.*, 48 F.4th at 940; *see also Klamath Irrigation Dist. v. United States*, 635 F.3d 505, 508 (Fed. Cir. 2011) ("In light of its dual purposes of serving agricultural uses and providing for the needs of wildlife, the Klamath Project is subject to the requirements of the Endangered Species Act.").

Here, KDD's diversions pursuant to its 1977 Water Permit hinder Reclamation's ability to operate the Klamath Project in compliance with its ESA obligations and Tribal federal reserved water rights. As this Court has noted, Reclamation has the "nearly impossible" task of balancing multiple, often competing interests in the Klamath Basin. *Klamath Irrigation Dist.*, 48 F.4th at 940 (quoting *Klamath Irrigation Dist.*, 489 F. Supp. 3d at 1173). Reclamation finalizes its operations and drought plans after extensive consultation and coordination with USFWS and NMFS to ensure that Reclamation's operation of the Klamath Project does not jeopardize the continued existence of ESA-listed species or adversely modify their critical habitat. The 2020

USFWS BiOp and the 2019 NMFS BiOp set specific requirements for elevations in UKL and

flows in the Klamath River that Reclamation must maintain. During years of severe drought,

there is not enough water to meet the needs of ESA-listed species while also providing a full

Project supply for contractors. As a result, Reclamation must decrease water allocations to

Project contractors.

The Ninth Circuit has determined that irrigators' rights are "subservient" to the Tribes'

rights and Reclamation's ESA responsibilities. *In re Klamath Irrigation Dist.*, 69 F.4th at 939;

*see also Patterson*, 204 F.3d at 1213 ("[Reclamation's] responsibilities include taking control of

the [Link River] Dam when necessary to meet the requirements of the ESA, requirements that

override the water rights of the Irrigators."). The parties entered into the 1943 Contract over

thirty years before KDD obtained its 1977 Water Permit. Allowing KDD to sidestep

Reclamation's water allocation under the terms of the 1943 Contract would disturb

Reclamation's careful balance of these competing interests. After Reclamation allocates no water

to a Project contractor pursuant to the parties' contract, that contractor's diversions of water

pursuant to a state permit is directly inconsistent with clear congressional directives. *See Hill*,

437 U.S. at 174 ("Congress intended endangered species to be afforded the highest of

priorities."). As such, state water law does not control in the distribution and use of Project water

here.

Plaintiff acknowledges that Reclamation does not have authority over non-Project

diversions south of the Link River Dam made pursuant to a state water permit. There are private

individuals and entities who divert water downstream from the Link River Dam pursuant to

water permits issued by OWRD. Heck Dep. 143:16–144:2, ECF No. 62-1. Reclamation

considers these diversions "a systemic loss" of water in UKL that is "out of [Reclamation's]

control[.]" *Id.* at 146:11–21. However, these private water users are not similarly situated to KDD. Unlike these private water users, KDD entered into multiple contracts with Plaintiff to become part of the Project, and Plaintiff helped KDD reclaim the lands within its boundaries. *See, e.g.*, Heck Decl., Ex. B, ECF No. 65-2. The 1943 Contract relieved KDD of further payments under the 1917 Contract. *See* 1943 Contract, Art. 11. KDD cannot reap all the benefits of being a Project contractor without assuming obligations.

KDD suggests that Reclamation should have made a senior priority call with OWRD to prevent KDD from diverting water pursuant to its 1977 Water Permit. *See* Def.'s Resp. 26 n.23, ECF No. 75. When a senior appropriator makes a call on a water right, OWRD can validate the call and issue regulation orders to junior appropriators with instructions to stop diverting water. *Buchanan*, 2023 WL 5093879, at *5; *see also Yurok Tribe*, 2023 WL 1785278, at *5 ("If the investigation reveals a valid complaint, the watermaster may begin to regulate the water 'in accordance with the relative rights or rotation agreements of the appropriators involved in the complaint or shortage.'" (quoting Or. Admin. R. 690-250-0100)). However, expecting Reclamation to wait until OWRD investigates the water shortage would render Reclamation's ability to plan for an irrigation season impossible. Reclamation publishes an annual operations plan to inform interested parties of how Reclamation intends to operate the Project during that year's season. Heck Decl. ¶ 15, ECF No. 65; *see also Klamath Irrigation Dist.*, 48 F.4th at 940–41. If the available water is less than the amount necessary to satisfy the demands of all Project irrigators, Reclamation issues a drought plan with additional details regarding the allocation of the limited water supply based on the contractual seniority of the various Project contractors. Heck Decl. ¶ 15, ECF No. 65. Reclamation can make no definite plans if it must wait until

OWRD investigates a water shortage before Project contractors can be prevented from diverting water pursuant to a state permit.

The Court is mindful of the extraordinary challenges Reclamation faces in its operation of the Klamath Project. The Court also acknowledges the extreme impacts of successive drought years on the people and wildlife of the Klamath Basin. However, allowing a Project contractor to divert water pursuant to a state permit when Reclamation has allocated no water under the terms the parties' contract would be directly inconsistent with clear congressional directives "to halt and reverse the trend toward species extinction, whatever the cost." *Hill*, 437 U.S. at 184. As such, KDD breached Articles 14 and 35 of the 1943 Contract when KDD diverted water after Reclamation allocated KDD zero water and repeatedly instructed KDD not to divert water.

## III.    Relief

Plaintiff asks this Court to issue a declaratory judgment stating that the 1943 Contract "requires KDD to comply with Reclamation's rules and regulations, including Reclamation's Plans and directives, and to divert water only as agreed upon with Reclamation." Pl.'s Mot. 21, ECF No. 64. Plaintiff also asks this Court to permanently enjoin KDD from diverting water when Reclamation has not authorized those diversions from the Klamath River. *Id.* at 23.

### A.    Permanent Injunction

A plaintiff seeking a permanent injunction must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). When the government is a party, the last two factors merge. *See California v. Azar*, 911

F.3d 558, 581 (9th Cir. 2018) (citing *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)). In applying these elements, "[t]he standard for a preliminary injunction is essentially the same as for a permanent injunction," and cases interpreting the preliminary injunction standard apply "with equal force to ... permanent injunction cases." *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 996 (9th Cir. 2011) (internal citations omitted). The Ninth Circuit employs a "sliding scale" approach, meaning that "a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

First, Plaintiff has demonstrated that it has suffered an irreparable injury from KDD's diversions. During drought years, "Reclamation has the nearly impossible job of complying with numerous important, long-standing obligations." *Klamath Irrigation Dist.*, 489 F. Supp. 3d at 1173. KDD's diversions upset the careful balance Reclamation tries to strike each year in formulating plans that comply with its legal obligations and satisfy as many competing interests as possible. KDD's diversions also make it even more difficult for Reclamation to comply with the terms of the 2020 USFWS BiOp and the 2019 NMFS BiOp during drought years. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable." *Amoco Production Co. v. Gambell*, 480 U.S. 531, 545 (1987). "Once a member of an endangered species has been injured, the task of preserving that species becomes all the more difficult." *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 785 (9th Cir. 1995). As such, the first factor favors issuance of an injunction.

Second, Plaintiff has demonstrated that money damages are inadequate to compensate for its injury. Environmental injury "can seldom be adequately remedied by money damages[.]"

*Amoco Production*, 480 U.S. at 545. The risk and harm to ESA-listed species and their critical habitats cannot be quantified in terms of monetary damages. The suckers in UKL play a "central role in the Tribes' cultural and spiritual practices, and they were once the Tribes' most important food-fish." *Klamath Irrigation Dist.*, 489 F. Supp. 3d at 1173. As such, the second factor favors issuance of an injunction.

Finally, Plaintiff has demonstrated that the balance of hardships and the public interest weigh in its favor. Irrigators within KDD's boundaries will no doubt suffer economic hardship if KDD is enjoined from diverting excess water. These irrigators rely on water deliveries and make investments in crops based upon expected water deliveries. *See id.* at 1175. "Delayed access to or decreased amounts of water cause 'long-reaching damages' to the irrigators' businesses." *In re Klamath Irrigation Dist.*, 69 F.4th at 939. However, economic hardship alone is generally not enough. *Bernhardt v. Los Angeles Cty.*, 339 F.3d 920, 931 (9th Cir. 2003) (citation omitted). Meanwhile, ESA-listed species will bear the brunt of Plaintiff's hardships in the absence of an injunction. The Ninth Circuit recognizes "the well-established public interest in preserving nature and avoiding irreparable environmental injury." *Cottrell*, 632 F.3d at 1138 (citation and internal quotation marks omitted). Here, the balance of hardships and the public interest tip heavily in Plaintiff's favor.

In sum, all four factors favor issuance of an injunction. Defendant is permanently enjoined from diverting water from the Klamath River when Reclamation has not authorized such diversions under the terms of the 1943 Contract.

### B.    Declaratory Judgment

The Declaratory Judgments Act gives a federal court the discretion to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

Here, the Court finds that a declaratory judgment would be unnecessarily duplicative of the permanent injunction. As such, the Court declines to issue a declaratory judgment.

## ORDER

For the reasons above, Plaintiff's Motion for Summary Judgment (ECF No. 64) is GRANTED and Defendant's Motion for Summary Judgment (ECF No. 60) is DENIED. The Court permanently enjoins Defendant from diverting water from the Klamath River when Plaintiff has not authorized such diversions under the terms of the parties' 1943 Contract.

IT IS SO ORDERED and DATED this ___ day of September, 2023.


MARK D. CLARKE
United States Magistrate Judge